**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| IN RE: | |
| BRAZOS ELECTRIC POWER COOPERATIVE, INC., | Bankruptcy Case No. 21-30725 (DRJ) |
| *Debtor.* | Adv. Proc. No. 21-03863 (DRJ) |
| ELECTRIC RELIABILITY COUNCIL OF TEXAS, INC., *et al.*, | |
| *Appellants*, | Civil Action No. 4:21-cv-03692 |
| v. | |
| BRAZOS ELECTRIC POWER COOPERATIVE, INC., *et al.*, | |
| *Appellees.* | |

**ELECTRIC RELIABILITY COUNCIL OF TEXAS, INC.'S AND DEFENDANT-INTERVENORS CALPINE CORPORATION, NRG ENERGY, INC., NEXTERA ENERGY MARKETING, LLC, ENGIE ENERGY MARKETING NA, INC., AND TALEN ENERGY SUPPLY, LLC'S
MOTION FOR CERTIFICATION OF DIRECT APPEAL**

Pursuant to 28 U.S.C. § 158(d)(2) and Federal Rule of Bankruptcy Procedure 8006, Appellant Electric Reliability Council of Texas, Inc. ("ERCOT") and Appellant-Intervenors Calpine Corporation et al.[1] ("Intervenors") respectfully request that this Court certify the pending appeal in *In re Brazos Electric Power*, No. 4:21-cv-03692, for direct review by the United States Court of Appeals for the Fifth Circuit.

---

[1] Appellant-Intervenors (Defendant-Intervenors in the Adversary Proceeding below) are Calpine Corporation; Tenaska Power Services Co.; NRG Energy, Inc.; ENGIE Energy Marketing NA, Inc.; Talen Energy Supply, LLC; Golden Spread Electric Cooperative, Inc.; South Texas Electric Cooperative; and NextEra Energy Marketing, LLC.

1

## I.    PRELIMINARY STATEMENT

Appellants have filed a motion for leave requesting an interlocutory appeal of the bankruptcy court's order refusing to abstain under *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943) and refusing to dismiss certain claims under Federal Rule of Civil Procedure 12(b)(7). That motion for leave is pending in this Court and will be the subject of a hearing the Court scheduled for December 29. Appellants maintain that this appeal not only satisfies the 28 U.S.C. § 1292(b) requirements for interlocutory review but also satisfies the 28 U.S.C. § 158(d)(2) requirements for direct appeal to the Fifth Circuit Court of Appeals. Thus, Appellants also file this motion seeking certification to the Fifth Circuit in the event that this Court agrees that this appeal warrants certification to the Fifth Circuit.

Certification for direct review is appropriate for two reasons. First, this appeal "involves a matter of public importance" because it goes to the question of whether the federal courts will respect the sovereign interest (and sovereign immunity) of the State of Texas in regulating its state electric grid during and after an unprecedented public emergency.[2] This issue arises in the underlying appeal both from Debtor Brazos Electric Power Cooperative's ("Brazos") failure to join the relevant state regulator, the Public Utility Commission of Texas ("PUCT"), as an indispensable party under Federal Rule of Civil Procedure 12(b)(7), which it cannot do because of the PUCT's sovereign immunity, and from the bankruptcy court's decision not to abstain under *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943). Both raise the fundamental question of whether the power to regulate the statewide electricity market and electric grid belongs to the State of Texas or to the bankruptcy court below—a question that is undeniably "a matter of public importance."[3]

---

[2] 28 U.S.C.  § 158(d)(2)(A)(i).

[3] *Id.*

2

Second, the immediate resolution of that question by the Fifth Circuit would "materially advance the progress of the case," which is likewise independently sufficient to warrant certification for direct review.[4] The bankruptcy court in this district has previously recognized where "any decision by the District Court  . . . is very likely to be appealed to the Fifth Circuit" due to the amount of money at stake, direct review by the circuit would materially advance the case.[5]  In the present appeal, *nearly two billion dollars* are at stake, making an eventual appeal to the Fifth Circuit all but inevitable. Moreover, the claims at issue in this appeal are central to the underlying bankruptcy case, so obtaining immediate and final resolution of the issues raised in this appeal will materially advance that entire case. Certification for direct review is therefore warranted.

## II.    BACKGROUND

### A.    Regulation of Texas' Intrastate Electric Grid and Market.

The majority of Texas is served by one intrastate electric grid. As a matter of state policy, this grid has been deliberately maintained independent of the national grid to preserve Texan, not federal, regulatory authority. Texas's grid is regulated by the PUCT.[6] Under Texas's Public Utility Regulatory Act ("PURA"), the PUCT is required "to adopt and enforce rules relating to the reliability of the regional electrical network and accounting for the production and delivery of electricity among generators and all other market participants" in the Texas energy market.[7]

PURA requires the PUCT to certify an "independent organization" to perform critical functions related to the Texas electric grid and energy market, while reserving to the PUCT

---

[4] *Id.* § 158(d)(2)(A)(iii).

[5] *See In re MPF Holding U.S. LLC*, 444 B.R. 719, 727–28 (Bankr. S.D. Tex. 2011) (certifying direct appeal in a case with "over $25.0 million" at stake).

[6] 16 TEX. ADMIN. CODE § 25.1(a).

[7] TEX. UTIL. CODE § 39.151(d).

complete authority over that organization.[8] ERCOT is this independent organization. The PUCT has plenary oversight authority over ERCOT, which is "directly responsible and accountable" to the PUCT and must "fully cooperate" with the PUCT's oversight, including following its rules and orders.[9] ERCOT operates as a revenue-neutral clearinghouse: it is "the central counterparty for all transactions settled by ERCOT," and "the sole buyer to each seller, and the sole seller to each buyer, of all energy."[10]

ERCOT's rules, known as Protocols,[11] have the force and effect of state law, and all market participants are statutorily required to obey them.[12] Under the Protocols, ERCOT calculates market clearing prices of energy and other ancillary services "**[e]xcept as otherwise directed by**" the PUCT.[13] Indeed, the PUCT retains the supervening authority to "tak[e] actions necessary to protect the public interest, including actions that are otherwise inconsistent with the provisions in this section."[14]

## B. The Winter Storm.

Starting on February 13, 2021, a severe storm known as Winter Storm Uri blanketed Texas in snow and ice and sent temperatures in many places across the state plunging well below freezing. These extremely unusual weather conditions resulted in extraordinary hardship,

---

[8] Id. § 39.151(a), (d).

[9] *Id.* §§ 39.151(d), (d-4)(5).

[10] Nodal Protocols § 1.2(4). ERCOT's Protocols are available at http://www.ercot.com/mktrules/nprotocols/current.

[11] 16 TEX. ADMIN. CODE. § 25.501(a).

[12] TEX. UTIL. CODE *Id.* § 39.151(j); *PUCT v. Constellation Energy Commodities Grp., LLC*, 351 S.W.3d 588, 594–95 (Tex. App.—Austin 2011, pet. denied).

[13] 16 TEX. ADMIN. CODE. § 25.501(a).

[14] *Id.* § 25.505(h).

suffering, and economic loss.  During Winter Storm Uri, unprecedented demand for electricity overwhelmed the available supply, even as the cold caused nearly 50% of the ERCOT region's power-generating capacity to go offline.[15] In response, ERCOT declared an Energy Emergency Alert Level 3 ("EEA3"), its highest alert level, reflecting a severe lack of reserve energy availability. During EEA3, transmission operators were required to substantially curtail load, a process known as load shed. In other words, ERCOT directed transmission service providers to impose rolling electricity outages because the only alternative was the complete failure of the electricity grid.

Texas's regulatory framework was designed to create a market response to such emergencies, raising prices to a pre-set regulatory maximum price of $9,000/MWh to signal the urgent need for electricity.[16] Yet during the Winter Storm Uri emergency—exactly when such a signal was most needed to avert humanitarian disaster—energy prices on the ERCOT market began to clear below the regulatory maximum.[17]

The PUCT thus ordered ERCOT to adjust its prices to take account of the demand that was being left unmet due to the mandatory load shed.[18] As the PUCT explained, because "scarcity

---

[15] Am. Compl. ¶ 36 [Adv. Dkt. No. 173].

[16] 16 TEX. ADMIN. CODE § 25.505(a) ("scarcity pricing mechanism for the ERCOT market"); Order Directing ERCOT to Take Action and Granting Exception to Commission Rules ("PUCT 2/15/21 Order") [Bankr. Dkt. 23-1] at 1 ("Energy prices should reflect the scarcity of the supply. If customer load is being shed, scarcity is at its maximum, and the market price for the energy needed to serve that load should also be at its highest."); Second Order Directing ERCOT to Take Action and Granting Exception to Commission Rules ("PUCT 2/16/21 Order") [Bankr. Dkt. 23-2] at 1 (same).

[17] PUCT 2/15/21 Order at 1; *see also* 16 TEX. ADMIN. CODE. § 25.505(g)(6)(B).  This was a problem not only because it failed to signal ERCOT's urgent need *for* electricity, but also because it failed to send signals to cut demand *on* ERCOT, e.g. by creating incentives for industrial uses of electricity to curtail and remain off.

[18] PUCT 2/16/21 Order at 2.

[was] at its maximum," "the market price for the energy . . . should also [have been] at its highest."[19] The PUCT therefore ordered ERCOT to adjust prices "to ensure they accurately reflect the scarcity conditions in the market" by "ensur[ing] that firm load that is being shed in EEA3 is accounted for in ERCOT's scarcity pricing signals."[20]

As it was required to do by statue, ERCOT complied with the PUCT's order by adjusting its pricing mechanism to set the price of electricity at the $9,000/MWh offer cap. ERCOT maintained this maximum pricing from the night of February 15 until the EEA3 ended on the morning of February 19.[21]

## C.    Brazos' Failure to Pay ERCOT and Its Claims in Bankruptcy.

Brazos, like other market participants, purchased, received, and re-sold electricity at the price ordered by the PUCT during the storm. After the storm, however, Brazos failed to pay ERCOT for $1.9 billion in energy purchased and received from ERCOT. Brazos subsequently filed for Chapter 11 bankruptcy protection.[22]

Because ERCOT operates as a revenue-neutral clearinghouse, the money that Brazos owes ERCOT is, in turn, owed by ERCOT to the market participants that generated and sold energy during the storm. Moreover, because of the default-uplift protocols contained in the design of the PUCT-regulated market, any portion of the $1.9 billion owed by Brazos that is not paid to ERCOT will ultimately be charged to other market participants like Intervenors.

After Brazos filed for bankruptcy, ERCOT filed a proof of claim seeking the $1.9 billion that Brazos owes for energy and ancillary services purchased during Winter Storm Uri. In

---

[19] PUCT 2/15/21 Order at 1; PUCT 2/16/21 Order at 1.

[20] *Id.*

[21] Am. Compl. ¶ 35.

[22] Bankr. Dkt. 1.

response, Brazos filed an adversary complaint seeking to disallow or reduce ERCOT's claim based on allegations that by following the PUCT's binding orders, ERCOT violated the Protocols and the Standard Form Market Participant Agreement ("SFA"), the statutorily required contract with Brazos that allows Brazos to participate in the ERCOT market.

But PURA requires that all challenges to the PUCT's orders be brought in state district court in Travis County or in the Third Court of Appeals (which sits above that district court), in order to ensure consistency in the interpretation and application of those orders.[23] This requirement is part of PURA's "comprehensive and adequate regulatory system for electric utilities."[24] ERCOT's Protocols also provide a procedure for billing disputes, from which judicial review can be sought once administrative remedies are exhausted.[25] The Texas Supreme Court has recognized the unique and exclusive role that the PUCT and Texas state courts play in administering the PURA's comprehensive regulatory scheme.[26]

---

[23] *See* TEX. GOV'T CODE § 2001.176(b)(1); TEX. UTIL. CODE §§ 11.007(a), 15.001 (together, permitting judicial review of PUCT orders in Travis County district court); *see also id.* § 39.001(e) (providing that a "competition rule" must be challenged directly in the Third Court of Appeals).

[24] TEX. UTIL. CODE § 31.001(a).

[25] *See* Nodal Protocols §§ 9.14 (billing disputes), 20 (alternative dispute resolution); 16 TEX. ADMIN. CODE § 22.251(b) (permitting complaints against ERCOT to be filed with the PUCT); TEX. UTIL. CODE § 15.001 (permitting judicial review of a PUCT proceeding).

[26] *In re Entergy Corp.*, 142 S.W.3d 316, 323 (Tex. 2004) (The Legislature "intended PURA to be the exclusive means of regulating electric utilities in Texas."); *Oncor Elec. Delivery Co., LLC v. Chaparral Energy, LLC*, 546 S.W.3d 133, 139–40 (Tex. 2018) (finding the PUCT had exclusive jurisdiction over customer's breach of contract claim for monetary damages against a utility because of PURA's comprehensive regulatory scheme over utilities in Texas); *Oncor Elec. Delivery Co., LLC v. Giovanni Homes Corp.*, 438 S.W.3d 644, 657-58 (Tex. App.—Fort Worth 2014, pet. denied) (holding that the PUCT had exclusive jurisdiction over a breach of contract claim because the utility's tariff and the PUCT rules governed the provision of service for which the plaintiff had contracted).

Numerous other market participants have filed or intervened in challenges to the validity and application of the PUCT pricing orders during Winter Storm Uri in state courts.[27] Market participants (including Brazos) have also filed billing disputes with ERCOT that, under the ERCOT protocols, may ripen into PUCT proceedings or state-court lawsuits.[28] As Texas law prescribes, any relief granted in these proceedings is subject to review in the Travis County district court, the Third Court of Appeals, and the Supreme Court of Texas, and would be implemented by the PUCT.

**D.      ERCOT's Motion to Dismiss.**

ERCOT filed a motion to dismiss certain of Brazos's claims on grounds of Rule 12(b)(6), *Burford* abstention, and failure to join the PUCT as an indispensable party.[29] ERCOT explained that Brazos's complaint directly implicates the applicability and interpretation of the PUCT's emergency orders, and thus it is an attempt to end-run Texas's pervasive regulatory scheme governing its intrastate energy market. The energy prices at the heart of this dispute were charged pursuant to the PUCT's orders and consistent with the ERCOT market design. The Protocols provide that ERCOT sets energy prices "[e]xcept as otherwise directed" by the PUCT, while the SFA explicitly states that it is "subject to" PUCT orders, which "shall prevail" in the event of a conflict with the SFA's terms.[30] The *Burford* abstention doctrine was created to enable—and

---

[27] *E.g.*, *Luminant Energy Co. v. PUCT*, No. 03-21-00098-CV (Tex. App.—Austin Mar 2, 2021); *Exelon Generation Co. v. PUCT*, No. D-1-GN-21-001772, 2021 WL 1587964 (53rd Dist. Ct., Travis County, Tex. Apr. 19, 2021); *RWE Renewables Americas LLC v. D'Andrea*, No. D-1-GN-21-001839, 2021 WL 1623894 (201st Dist. Ct., Travis County, Tex. Apr. 21, 2021).

[28] *See* Nodal Protocols §§ 9.14 (billing disputes); 16 TEX. ADMIN. CODE § 22.251(b) (permitting complaints against ERCOT to be filed with the PUCT); TEX. UTIL. CODE § 15.001 (permitting judicial review of a PUCT proceeding).

[29] ERCOT's Mot. to Dismiss [Adv. Dkt. 23].

[30] 16 TEX. ADMIN. CODE. § 25.501(a); SFA § 11(L).

instruct—federal courts to avoid being drawn into such matters of state regulation.[31] Because this case depends upon the applicability and interpretation of the PUCT's orders, it is a matter on which the federal courts must defer to the state.

ERCOT further explained that for much the same reasons, the PUCT's absence in this proceeding is fatal. The PUCT is a party to the concurrent state proceedings. If there were a judgment in favor of the challengers in those proceedings, the PUCT likely would be ordered to conduct further proceedings and even to issue new orders to ERCOT. If ERCOT obeys a conflicting judgment by the bankruptcy court, it may violate state law and risk discipline or decertification by the PUCT, which will not be bound by the bankruptcy court's ruling. The PUCT is thus an indispensable party, without which the adversary proceeding cannot continue.

The bankruptcy court dismissed Count 1 of Brazos's complaint but refused to abstain or dismiss for failure to join an indispensable party.[32] ERCOT and Intervenors have sought leave to appeal the portions of the bankruptcy court's order refusing to abstain or dismiss on indispensable-party grounds, initiating the present appeal.[33] Brazos then amended its complaint as to Count 1. ERCOT and Intervenors again moved to dismiss on Rule 12(b)(6), *Burford* abstention, and indispensable-party grounds.[34] The bankruptcy court denied that motion, and ERCOT and Intervenors filed a supplemental motion for leave to appeal the bankruptcy court's order refusing

---

[31] *See Burford*, 319 U.S. at 332 ("[Q]uestions of regulation of the industry by the state administrative agency . . . so clearly involves basic problems of Texas policy that equitable discretion should be exercised to give the Texas courts the first opportunity to consider them."); *id.* at 327, 334.

[32] Order [Adv. Dkt. No. 137] at 2.

[33] Notice of Appeal [Adv. No. Dkt. 208]; Mot. Leave to Appeal [Adv. Dkt. No. 209].

[34] ERCOT's Emergency Mot. to Dismiss [Adv. Dkt. No. 191]; Def.-Intervenors' Mot. to Dismiss [Adv. Dkt. No. 193].

to abstain or dismiss on indispensable-party grounds Brazos's amended complaint.[35] That appeal

resulted in a new civil action styled No. 4:21-cv-03877, though the issues presented in both appeals

are the same. The Court has consolidated the appeals.

The bankruptcy court has scheduled a trial in the adversary proceeding to begin on

February 21, 2022.[36] Absent intervention by a higher court on the abstention and indispensable-

party issues, this trial will treat the dispute over the ERCOT-set prices as if they were routine

contract claims, rather than questions of statewide impact that cut to the heart of Texas's unique

system of electricity regulation. Moreover, it will require adjudication of these issues in federal

bankruptcy court rather than state court, and in the absence of the relevant state regulator, the

PUCT.

### III.   QUESTION PRESENTED FOR DIRECT REVIEW

The questions to be decided on appeal are:

    a.   Does *Burford* require the bankruptcy court to abstain from deciding
Brazos's claims that the price of energy during the storm was inconsistent
with PURA, ERCOT's Protocols, and/or the SFA; or that the PUCT's
pricing orders are not applicable to amounts Brazos owes ERCOT pursuant
to storm-related invoices?

    b.   Does Brazos's failure to join the PUCT require dismissal of Brazos's claims
that the price of energy during the storm was inconsistent with PURA,
ERCOT's Protocols, and/or the SFA; or that the PUCT's pricing orders are
not applicable to amounts Brazos owes ERCOT pursuant to storm-related
invoices?

### IV.   RELIEF SOUGHT

In this motion, ERCOT and Intervenors respectfully request that this Court certify this

appeal for direct review in the Fifth Circuit Court of Appeals. In that underlying appeal, ERCOT

---

[35] Order [Adv. Dkt. No. 243] Suppl. Notice of Appeal [Adv.  Dkt. No 258].

[36] Sched. Order [Adv. Dkt. No. 13] at 3.

and Intervenors submit that the bankruptcy court erred in its October 22, 2021 and November 15, 2021 decisions denying *Burford* abstention and declining to dismiss the adversary complaint under Federal Rule of Civil Procedure 12(b)(7) for failure to join an indispensable party.

## V.      ARGUMENT AND AUTHORITIES

Under 28 U.S.C. § 158(d)(2), "on the request of a party," a district court "shall" certify an appeal from a bankruptcy court order for direct review by the court of appeals if any of the following conditions exists: (1) the order "involves a question of law as to which there is no controlling decision"; (2) the order "involves a matter of public importance"; (3) the order "involves a question of law requiring resolution of conflicting decisions"; or (4) an immediate appeal "may materially advance the progress of the case."[37]

For this Court to certify the order for direct review, only one of those conditions needs to be satisfied—and if any one of those conditions is satisfied, certification is mandatory.[38] Two of those statutory conditions are met in this case.

First, the orders being appealed "involve[] a matter of public importance,"[39] as they implicate Texas' authority to regulate its intrastate electrical market during and after an unprecedented natural disaster that threatened the state's electrical grid. Second, an immediate appeal would "materially advance the progress of the case," by immediately and finally resolving

---

[37] § 158(d)(2)(A)(i)-(iii), (B)(i); *see also In re OCA, Inc.*, 552 F.3d 413, 418 (5th Cir. 2008).

[38] 28 U.S.C. § 158(d)(2)(B) ("If … the district court … on the request of a party, determines that a circumstance specified in clause (i), (ii), or (iii) of subparagraph (A) exists … then … the district court … *shall* make the certification described in subparagraph (A)." (emphasis added)); *see, e.g.*, *Hobbs v. Buffets*, No. 5:19-CV-173-DAE, 2019 WL 12497543, at *2-3 (W.D. Tex. June 24, 2019); *In re Anloc, LLC*, No. 12–31267, 2013 WL 1397339, at *3 (Bankr. S.D. Tex. Apr. 4, 2013); *see also In re Ultra Petroleum Corp.*, No. 16-32202, 2017 WL 4863015, at *5 (Bankr. S.D. Tex. Oct. 26, 2017) ("Section 158(d) is disjunctive.").

[39] § 158(d)(2)(A)(i).

the pivotal issue in this multibillion-dollar dispute.[40] This Court should therefore certify the appeal for direct review.

## A.       The Issues Presented in This Appeal Involve a "Matter of Public Importance."

The question at the heart of this case is whether ERCOT, an organization designated under *Texas* law to regulate the *Texas* state utility grid using sovereign power delegated by the state of *Texas*, acted properly by following emergency orders by *Texas*'s Public Utility Commission requiring it to raise energy prices to their maximum allowable level to reflect severe scarcity during an unprecedented emergency in *Texas* that threatened the imminent collapse of *Texas*'s electrical grid. Brazos seeks to have these questions decided entirely by a federal bankruptcy court. This not only raises issues of *Burford* abstention, but also whether the Texas state wholesale power market and electric grid regulator is an indispensable party to this dispute whose absence requires dismissal under Rule 12(b)(7).[41] These issues indisputably involve matters of public importance that require certification of this appeal.

No one can dispute that Winter Storm Uri—a natural disaster of historic proportions—was a matter of extreme public importance, particularly in light of the danger it posed to Texas's electricity grid.[42] The public importance of state utilities regulation likewise cannot be reasonably questioned, especially in light of the Texas legislature's decision to create a public regulator (PUCT) and certify an independent organization (ERCOT) that are statutorily obligated to

---

[40] § 158(d)(2)(A)(iii); *see MPF Holding*, 444 B.R. at 727–28.

[41] *See* Mot. for Leave to Appeal 7–14.

[42] *See* PUCT 2/15/21 Order at 1-2 (noting the Governor's Declaration of the State of Disaster, ERCOT's declaration of "its highest state of emergency," and that "a public emergency exists" and ordering regulatory action in response); PUCT 2/16/21 Order at 2 (same).

administer the state electric grid in the public interest.[43] Whether those entities properly carried out their obligations under Texas law—and whether their actions should be reviewed by the state judicial mechanisms that the Texas legislature has enacted, or instead by a federal bankruptcy court, presents an issue of significant public importance.

Put simply, Texas has erected a unique intrastate electric grid and regulatory apparatus, and it has a sovereign interest in retaining control over that apparatus. If the bankruptcy court adjudicates Brazos's pricing claims as it is poised to do—without the Texas regulatory authority even being present—federal bankruptcy courts would stand open as a way to circumvent the Texas electric-regulatory regime. The federal courts would facilitate and control a renegotiation of Winter Storm Uri-related pricing, working a sea change in the way in which the myriad disputes arising out of Uri among electric companies are adjudicated. This would undermine the integrity of the electric-regulatory regime going forward, foster potential conflict with state courts and regulatory agencies, and have destabilizing downstream effects on every participant in the ERCOT market, and ultimately Texas consumers. These issues are soaked with public importance, involving critical questions regarding the interplay between bankruptcy courts and Texas state courts and what role each should play when it comes to settling the issues arising out of Winter Storm Uri.[44] A clear decision on this question from the Fifth Circuit will provide significant

---

[43] *See* TEX. UTIL. CODE § 31.001(c) ("[T]he public interest requires that rules, policies, and principles be formulated and applied to protect the public interest . . . ."); *see also Wilson v. Valley Elec. Membership Corp.*, 8 F.3d 311, 315 (5th Cir. 1993) ("[U]tility regulation 'is one of the most important of the functions traditionally associated with the police power of the States[.]'" (quoting *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 365 (1989))).

[44] *In re Pac. Lumber Co.*, 584 F.3d at 242 (holding that the impact of a bankruptcy on a local logging community and forest was "certainly sufficient under 28 U.S.C. § 158(d)(2)[(A)](i)" to support certification for direct appeal).

guidance to the many other courts and parties currently wrestling with Uri-related issues as to the relative spheres of Texas versus federal bankruptcy courts.

**B.      Direct Appeal Will "Materially Advance the Progress of" This Multibillion Dollar Case.**

Direct appeal will "materially advance the progress of the case"[45] for several reasons. First, it will accelerate the final resolution of the issues presented by bringing them directly to the Fifth Circuit—avoiding delay in a case that is all but certain to be appealed to the Fifth Circuit regardless of the result in this Court. As the bankruptcy court for this district has recognized, in cases where an appeal to the Fifth Circuit is inevitable in light of the amounts at stake, direct appeal will often materially advance the progress of the case and so warrant certification.[46] The amount at issue in this controversy—$1.9 billion—renders appeal to the Fifth Circuit of any decision by this Court certain. Indeed, the court in *MPF Holding* granted direct appeal to accelerate the inevitable in a case concerning only 1.3% the amount in controversy here.[47]   Under these circumstances, the interests of judicial efficiency warrant certification to accelerate final resolution of the issues presented here and the bankruptcy proceedings as a whole.

Certification is particularly warranted here because the resolution of the issues presented in the litigation will settle critical questions that will likely determine the rest of the bankruptcy.[48] Here, resolution "will probably determine" much of the rest of the bankruptcy case because there is no question that ERCOT's $1.9 billion claim is by far the single largest claim against Brazos's

---

[45] 28 U.S.C. §158(d)(2)(A)(iii).

[46] *In re MPF Holding U.S. LLC*, 444 B.R. at 727–28 (granting certification where "any decision by the District Court in this matter is very likely to be appealed to the Fifth Circuit" due to "the amount in controversy—over $25.0 million").

[47] *See id.*

[48] *See id.*

estate. Thus, a material reduction of this claim would not only result in more recovery to holders of unsecured claims in the Brazos bankruptcy case, but in reality govern the rest of the course of the bankruptcy.[49] Brazos recently acknowledged that resolving its disputes with ERCOT will "provide clarity around [its] go-forward business plan."[50]

Until we know whether ERCOT's asserted claim is valid, Brazos may claim an inability to develop any potential restructuring (or liquidation). Determining which court—Texas state or federal bankruptcy court—should decide that question is key, and will give shape to the rest of the bankruptcy case.

Finally, there is an interest-of-justice consideration that makes this case even more pressing. Absent swift resolution of this central, multi-billion-dollar question by the Court of Appeals *now*, the Bankruptcy Court's scheduled February trial may leave Brazos with arguments that any future appeal right is rendered equitably moot, preventing any appellate review at all of the bankruptcy court's rulings on the critical issues presented in this appeal.

In short, review in the Fifth Circuit—which would review this Court's conclusions *de novo* in any event—would serve judicial economy.[51] Because direct appeal would prevent that needless expenditure of time and resources and materially advance the underlying bankruptcy case, certification is appropriate.[52]

---

[49] *Id.* (noting that the allegedly preferential transfers represented the only "appreciable source[] of cash for payment of claims"); *see* Sched. A/B [Bankr. Dkt. No. 353] at 11 (listing $ 3.352 billion in total real and personal property for Brazos).

[50] *See* Second Mot. Extend Exclusivity [Bankr. Dkt. No. 1258] at 2.

[51] *See, e.g.*, *In re Spillman Dev. Grp.*, 710 F.3d 299, 304 (5th Cir. 2013) ("In bankruptcy appeals, 'we perform the identical task as the district court[.]'" (quoting *In re U.S. Abatement Corp.*, 79 F.3d 393, 397 (5th Cir. 1996))).

[52] *See, e.g.*, *Pac. Lumber*, 584 F.3d at 242 (approving certification where direct appeal would materially advance case); *see also In re Paige*, 610 F.3d 865, 870 (5th Cir. 2010) (approving

## VI.    CONCLUSION

For the foregoing reasons, ERCOT and Intervenors respectfully request that this Court certify this appeal for direct review by the United States Court of Appeals for the Fifth Circuit.

---

parties' certification that direct appeal would materially advance case by resolving outstanding adversary proceeding).

Respectfully submitted,

**MUNSCH HARDT KOPF & HARR, P.C.**

By: */s/ Jamil N. Alibhai*
Kevin M. Lippman
Texas Bar No. 00784479
klippman@munsch.com

Deborah Perry
Texas Bar No. 24002755
dperry@munsch.com

Jamil N. Alibhai
Texas Bar No. 00793248
jalibhai@munsch.com

Ross Parker
Texas Bar No. 24007804|
rparker@munsch.com
3800 Ross Tower
500 N. Akard Street
Dallas, Texas 75201-6659
Telephone: (214) 855-7500
Facsimile: (214) 855-7584

**COUNSEL FOR THE ELECTRIC
RELIABILITY COUNCIL OF TEXAS,
INC.**

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**

By: */s/ Ben A. Barnes*
David R. Seligman, P.C.
(*pro hac vice* forthcoming)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile:  (312) 862-2200
Email: david.seligman@kirkland.com

Mark McKane, P.C.
(*pro hac vice* forthcoming)
555 California Street
San Francisco, California 94104
Telephone: (415) 439-1400
Facsimile:  (212) 439-1500
Email: mark.mckane@kirkland.com

Aparna Yenamandra
(*pro hac vice* forthcoming)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile:  (212) 446-4900
Email: aparna.yenamandra@kirkland.com

Ben A. Barnes
Texas Bar No. 24092085
SD Tex. No. 2470694
1601 Elm Street
Dallas, Texas 75201
Telephone:  (214) 972-1770
Facsimile:  (214) 972-1771
Email: ben.barnes@kirkland.com

**COUNSEL FOR CALPINE**
**CORPORATION**

**SHEARMAN & STERLING LLP**
By: */s/ C. Luckey McDowell*
C. Luckey McDowell
Texas Bar No. 24034565
Email: luckey.mcdowell@shearman.com

Ian E. Roberts
Texas Bar No. 24056217
2828 N. Harwood Street, Suite 1800
Dallas, Texas 75201
Telephone: (214) 403-0649
Email: ian.roberts@shearman.com

Joel Moss (admitted *pro hac vice*)
535 Mission Street, 24th Floor
San Francisco, CA 94105
Telephone: (212) 848-4693
Email: joel.moss@shearman.com

Jonathan M. Dunworth
(admitted *pro hac vice*)
599 Lexington Avenue
New York, NY 10022
Telephone: (212) 848-5288
Email: jonathan.dunworth@shearman.com

**COUNSEL FOR NRG ENERGY, INC.,
ENGIE ENERGY MARKETING NA,
INC., TALEN ENERGY SUPPLY, LLC,
AND NEXTERA ENERGY
MARKETING, LLC**

December 9, 2021

## **CERTIFICATE OF CONFERENCE**

I certify that on October 28 and 29, 2021, I conferred with Lino Mendiola, counsel for Brazos, regarding the relief sought in this motion. Brazos is opposed.

*/s/ Jamil N. Alibhai*
Jamil N. Alibhai

## **CERTIFICATE OF SERVICE**

I certify that on December 9, 2021, I caused a copy of the foregoing document to be served via CM/ECF on all counsel of record in this matter.

*/s/  Ben A. Barnes*
Ben A. Barnes